UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

WILLIAM GRANVILLE COBLIN, JR., *as*
*Executor of the Estate of Pollyann Coblin,*

   Plaintiff,

v.

DEPUY ORTHOPAEDICS, INC., *et al.*,

   Defendants.

)
)
)
)
)
)
)
)
)
)
)

Civil No. 3:22-cv-00075-GFVT-MAS

**MEMORANDUM OPINION**
**&**
**ORDER**

\*\*\* \*\*\* \*\*\* \*\*\*

  This matter is before the Court on Defendants' Motion to Exclude Plaintiff's Experts Dr. Mitchell and Dr. Gannon.  [R. 126.]  For the reasons stated herein, the Motion is **GRANTED IN PART AND DENIED IN PART.**

**I**

  On September 8, 2009, Pollyann Coblin arrived at St. Joseph Hospital in Lexington, Kentucky for a hip surgery.[1]  [R. 87 at 6.]  Ms. Coblin received a Pinnacle metal-on-metal hip implant allegedly manufactured, designed, and marketed by Defendants.  *Id.*

  In the ensuing years, Ms. Coblin experienced a litany of complications.  *Id.*  First, she noticed "right anterior thigh pain and swelling, numbness and tingling along the right lateral and medial thigh."  *Id.*  Then, she developed "foot drop."  *Id.*  In 2017, she was diagnosed with a pseudotumor in her right hip, "a result of metal-on-metal articulation."  *Id.*  Ms. Coblin

---

[1] The facts recounted here are taken from Plaintiff's Complaint and this Court's Order on Defendants' Motion to Dismiss.  [R. 87; R. 226.]

subsequently underwent a "right total hip arthroplasty" revision surgery because of "failure of total hip arthroplasty," "neuropathy of the right sciatic nerve," and "metallosis." *Id.*

What befell her next was a series of additional surgeries and treatments. *Id.* In spite of these procedures, she continued to "suffer significant pain" and ultimately lost the use of her leg. *Id.* Finally, during the pendency of this litigation, Ms. Coblin passed away. [R. 87-1.] Her estate alleges that her death was caused by complications from the implant. [R. 87 at 7.]

Specifically, the damage from the metal ion release allegedly caused Ms. Coblin to become immobile, while her repeated corrective surgeries allegedly resulted in lymphedema. [R. 134.] That immobility and/or lymphedema allegedly resulted in clotting. *Id.* Plaintiff claims that the clotting in turn caused Ms. Coblin's death. *Id.*

## II

First, Defendants urge the exclusion of Dr. Mitchell's cause of death opinion on the ground that he failed to provide an expert report. [R. 126 at 5–7.] Further, they challenge the testimony of Drs. Mitchell and Gannon on reliability grounds. *Id.* at 7–15. The Court agrees with the Defendants in part.

### A

Under Federal Rule of Civil Procedure 26(a)(2)(B) "disclosure of experts 'retained or specially employed to provide expert testimony' [must] be accompanied by a written report prepared and signed by the expert." *Terhune v. Cooksey*, No. 3:20-CV-611-DJH-CHL, 2022 WL 1644620, at *3 (W.D. Ky. May 24, 2022). But a treating physician is exempt from the report requirement so long as "'[he] does not purport to testify beyond the scope of [his] own diagnosis and treatment.'" *McFerrin v. Allstate Prop. & Cas. Co.*, 29 F. Supp. 3d 924, 934 (E.D. Ky. 2014)

2

(internal citation omitted).  Court assessing the scope of treatment look to "the 'core' of the patient's treatment, meaning what the physician learned through actual treatment and from the plaintiff's records up to and including that treatment." *Auto-Owners Ins. v. Aspas*, No. 3:16-cv-189-DJH-RSE, 2018 WL 4643190, at *4 (W.D. Ky. Sept. 27, 2018).

Both parties agree that the Plaintiffs failed to provide a 26(a) report for Dr. Mitchell. And during a *Daubert* hearing in this matter, Plaintiff's counsel appeared to concede that Dr. Mitchell's testimony on cause of death exceeds the scope of his treatment.  [R. 179 at 9.]  The Court agrees with Defendants that Mitchell's cause of death opinion is beyond the scope and therefore requires a report.

The Court will resolve the issue as follows: Dr. Mitchell needs to provide a report. Accordingly, he will not be permitted to testify as to cause of death unless he provides Defendants with his 26(a) report by May 7, 2024, at 1:30 p.m. (the time of the scheduling conference in this matter).[2]  At this juncture, without a report, the Court need not (and as a practical matter cannot) address the issue of Dr. Mitchell's methodology.  Moreover, if he provides a timely report, his testimony will be subject to any renewed Rule 702 objections raised by Defendants.

**B**

Next, Defendants challenge the qualifications and methodology of Plaintiff's expert, Dr. Gannon.

Federal Rule of Evidence 702 permits an expert to give opinion testimony if:

---

[2] Obviously, Dr. Mitchell can testify about matters within the scope of his treatment regardless of whether he ultimately provides a report.

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  A witness qualifies as an expert on the basis of his or her "knowledge, skill, experience, training, or education[.]"  Fed. R. Evid. 702.

The trial court serves an important gatekeeping function by ensuring that expert testimony is both reliable and relevant.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); Fed. R. Evid. 702 advisory committee's note to 2023 amendment.  Recent Amendments to Rule 702 emphasize the importance of this role.  *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendment. ("Judicial gatekeeping is essential because . . . jurors may [] lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support."); *see also In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 348 n.7 (6th Cir. 2024) ("Rule 702's recent amendments [] were drafted to correct some court decisions incorrectly holding 'that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility.'" (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendment)).  The proponent of expert testimony must establish its admissibility by a preponderance of the evidence.  *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

Defendants urge the exclusion of Dr. Gannon's cause of death opinion on the grounds that (1) he is not qualified and (2) he failed to employ a reliable methodology.[3]  [R. 126 at 7–12.]

**1**

First, the Court finds that Dr. Gannon is qualified to give a cause of death opinion.  Dr. Gannon is a Board-Certified Pathologist who teaches at Baylor College of Medicine.  [R. 134-5.] His Certification is in anatomic pathology, meaning he has experience and training in cause of death analysis.  *Id.*; *Johnson v. Memphis Light Gas & Water Div.*, 695 F. App'x 131, 133 n.3 (6th Cir. 2017) ("'Anatomic Pathology' is 'the subspecialty of pathology that pertains to the gross and microscopic study of organs and tissues removed for biopsy or during post mortem examination, and also the interpretation of the results of such study.'" (quoting Steadman's Medical Dictionary ¶ 662110 (2014)).  In fact, he has performed over 300 autopsies throughout his 30-year career.  [R. 134-5; R. 134-6.]   His decades-long teaching experience includes instructing medical students on clotting and coagulation.  [R. 134-5; R. 134-6.]  Gannon's CV boasts a litany of academic publications and editorial review positions.  [R. 134-5.]  Further, he has contributed to seven medical textbooks and publications, a subset of which cover topics in orthopedic practice and surgery.  *Id.*  Although it is true that he is not a vascular surgeon or cardiologist, the Court finds him qualified as an expert in pathology because of his knowledge, training, education, skill, and experience.  *See In re Heparin Prods. Liab. Litig.*, 803 F. Supp. 2d 712, 747 (N.D. Ohio 2011), *aff'd sub nom. Rodrigues v. Baxter Healthcare Corp.*, 567 F. App'x

---

[3] Defendants also argue that the Court should strike Dr. Gannon's affidavit appended to Plaintiff's response because "experts are supposed to explain their qualifications in their expert reports, not in affidavits executed in response to Rule 702 motions."  [R. 148 at 4.]  The Court will deny the request because Defendants have been on notice of Dr. Gannon's Curriculum Vitae (CV), and therefore the affidavit provided does not come as an unfair surprise.  *Cf. U.S. ex rel. Gudur v. Deloitte Consulting LLP*, No. CIV.A. H-00-1169, 2007 WL 4322433, at *13 (S.D. Tex. Mar. 5, 2007) (striking an untimely affidavit because it went "far beyond" the expert's "prior reporting of his qualifications").

359 (6th Cir. 2014) ("'[A] doctor need not be a specialist in the exact area of medicine implicated by the plaintiff's injury.'") (internal citation omitted); *see also id.* ("So long as the expert has some specialized knowledge as a result of training or experience relevant to the opinions he offers, his testimony will meet the qualification requirement.").

**2**

Next, Defendants challenge Gannon's methodology.  [R. 126 at 8–12.]  In particular, they assert that his cause of death opinion is unreliable because he failed to conduct a differential etiology.  *Id.*  Further, his opinions are mere ipse dixit.  *Id.*; [*see also* R. 179.]  The Court disagrees with the Defendants with the exception of one issue.  The Court will give the Plaintiff a chance to cure the problem.

"Rule 702 requires a district court to determine whether the evidence 'both rests on a reliable foundation and is relevant to the task at hand.'"  *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001) (quoting *Daubert*, 509 U.S. at 597).  "The district court must determine 'whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue.'"  *Id.*

"Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated."  *Hardyman*, 243 F.3d at 260.  When performing a differential diagnosis, "[t]he physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case

6

history."[4] *Id.* (internal citation omitted).  A differential diagnosis will be admissible insofar as the physician (1) "objectively ascertains, to the extent possible, the nature of the patient's injury"; (2) "'rules in' one or more causes of the injury using a valid methodology"; and (3) "engages in 'standard diagnostic techniques by which doctors normally rule out alternative causes' to reach a conclusion as to which cause is most likely.'" *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 179 (6th Cir. 2009) (internal citation omitted).

Still, "an opinion on medical causation does not necessarily have to be produced through a differential diagnosis." *Willis v. Abbott Lab'ys*, No. 1:15-CV-00057-JHM, 2017 WL 5988215, at *15 (W.D. Ky. Dec. 1, 2017).  At bottom, "[w]hat matters is that the methodology was reliable[.]" *Id.*

Here, the physical exam portion of a differential diagnosis may not have been feasible because "Mrs. Coblin[] passed away; [Dr. Gannon] can't examine her."  [R. 179 at 55]; *see also id.* at 56–57 ("Of course, nobody goes to a pathologist for treatment."); *Best*, 563 F.3d at 179 ("[T]he steps a doctor has to take to make [a] (differential) diagnosis reliable are likely to vary from case to case.") (internal citation omitted).  Accordingly, Gannon "[did] what any normal pathologist would do[:]" he reviewed her medical records and tissue samples.  [R. 179 at 55]; *Best*, 563 F.3d at 181 ("[T]he expert must 'employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'") (internal citation omitted); *In re Wright Med. Tech. Inc., Conserve Hip Implant Prods. Liab. Litig.*, 127 F. Supp. 3d 1306, 1325 (N.D. Ga. 2015) ("It is commonly accepted that medical records and

---

[4] Still, "[c]alling something a 'differential diagnosis' or 'differential etiology' does not by itself answer the reliability question[.]"  *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010).

statements by a patient's treating physician are materials upon which testifying medical experts may reasonably rely.").

<strong>a</strong>

Even without a physical exam, the Court finds that Dr. Gannon's methodology is reliable apart from one issue.  First, Dr. Gannon objectively ascertained Ms. Coblin's cause of death. Based on his review of Ms. Coblin's medical records, history, and tissue samples, Dr. Gannon concluded that "wear debris" from the metal-on-metal implant were released into her joint tissue. [R. 126-3; R. 126-1.]  That caused "localized cellular death and significant scarring."  [R. 126-1.] The accumulation of metal debris from the implant resulted in "subsequent tissue destruction, bone damage, pain and difficulty ambulating, and [] revision surgery."  *Id.*  "The progressive nature of the clots follows from the lack of mobility, lymphedema and compromised circulation, and possible infections from her chronic wounds." [R. 126-3.]  Hence, according to Dr. Gannon, "the tissue damage from the metal-on-metal implant started a chain of events which resulted in the hastening of Mrs. Coblins death."  *Id.*

<strong>b</strong>

Secondly, Dr. Gannon appropriately 'ruled in' Ms. Coblin's cause of death through a reliable methodology.  Dr. Gannon relied on Ms. Coblin's medical records from 2017 through 2023.  [R. 126-1; R. 126-3.]  He also reviewed Ms. Coblin's tissue samples and reports from other physicians.  [R. 126-1.]  Dr. Gannon explained how he interpreted each tissue sample and how the samples informed his overall findings.  *See generally id.*

**c**

Third, and finally, the Court has concerns about the degree to which Dr. Gannon 'ruled out' other possible causes.  While Dr. Gannon ruled out Type 1, Type II, and Type IV "Hypersensitivity Reactions," he did not attempt to eliminate any of the Defendants' theories of alternative causation.  *Id.* at 3–4.

Doctors opining on causation need not rule out every possible cause.  *Best*, 563 F.3d at 181 ("[D]octors need not rule out every conceivable cause in order for their differential-diagnosis-based opinions to be admissible."); *Rheinfrank v. Abbott Lab'ys, Inc.*, No. 1:13-CV-144, 2015 WL 13022172, at *7 (S.D. Ohio Oct. 2, 2015), *aff'd*, 680 F. App'x 369 (6th Cir. 2017) ("[T]he fact that other potential causes may remain 'uneliminated' goes to the accuracy of the conclusion, not the soundness of the methodology, and would be properly addressed on cross-examination.").  However, Dr. Gannon's report does not appear to address *any* of Defendants' causation theories (for example, diabetes or arthrosclerosis).  The Sixth Circuit stated quite clearly in *Best* that to fulfill the 'rule out' requirement, a doctor "must provide a reasonable explanation as to why 'he or she has concluded that [any alternative cause suggested by the defense] was not the sole cause.'"  *Best*, 563 F.3d at 179 (internal citation omitted).

Accordingly, the Court agrees with the Defendants that Dr. Gannon needs to add to his report.  [*See* R. 179 at 58–60 (arguing that Dr. Gannon's Report is insufficient).]  The Court will permit Dr. Gannon to testify so long as he updates his report before the May 7, 2024, scheduling conference.  The updated report must explain why he ruled out the causes suggested by the Defendants.

## III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendants' Motion to Exclude **[R. 126]** is **GRANTED IN PART AND DENIED IN PART;**

2. Dr. Mitchell **SHALL** not be permitted to testify outside the scope of his treatment unless he provides a 26(a) Report before the May 7, 2024, scheduling conference;

3. The Defendants' request to exclude Dr. Mitchell based on his methodology is **DENIED without prejudice** to their ability to re-file assuming an expert report is provided; and

4. Dr. Gannon **SHALL** be permitted to testify on the condition that he updates his expert report to address the Defense's theories of alternative causation before the May 7, 2024, scheduling conference.

This the 10th day of April, 2024.

Gregory F. Van Tatenhove
United States District Judge